UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Patricia A. Jackson, | ) | Civil Action No. 4:03-3459-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Honda of South Carolina Mfg., Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the parties' cross motions for summary judgment against the opposing party's respective claims. Plaintiff initially filed this action *pro se* on October 31, 2003. After she retained an attorney, she amended her complaint, alleging causes of action for racial harassment under Title VII, 42 U.S.C. §2000e, *et seq.* and 42 U.S.C. §1981a; retaliatory harassment under the same statutes; retaliation/wrongful termination; and breach of contract. Defendant filed its answer and counterclaim alleging causes of action under state law. A hearing was held August 2, 2006. The matter is now ripe for decision.

## *Facts*

Much of the factual presentation submitted by the defendant has not been disputed by the plaintiff. Therefore, except as indicated, the "facts" are generally set forth as presented by defendant.

Honda of South Carolina (Honda) is engaged in the manufacture of all terrain vehicles (ATV's) and personal watercraft at its facility in Timmonsville, South Carolina. Honda maintains Operating Philosophy and written employment guidelines prohibiting discrimination based upon race. (Exh. 5 and Exh. 6 to Defendant's Motion).

-1-

Honda's facility is divided primarily into two departments: Manufacturing and Administration. Within the two departments, there are a number of separate sections and subsections. (Exh. 2, ¶8 to Defendant's Motion). Each section is headed by one or two coordinators. The coordinators are assisted by support staff. The associates, the designation used by Honda for employees, in each section are generally divided into teams assigned to a particular process. (Exh. 2, ¶9 to Defendant's Motion).

During the time plaintiff was employed at Honda, each shift also had a team advisor (TA). At that time, it was envisioned that every production associate eventually was required to fulfill a TA assignment, which lasted six weeks and was rotated among the production associates within a particular section. Associates fulfilling their TA assignments were paid approximately $.40 more per hour. Serving as a TA was a temporary assignment, not a promotion. In addition to Honda's associates, who work full time, there are temporary associates at the plant who are employed by temporary employment agencies and assigned to Honda. These temporary associates are not employees of Honda, are not considered for any advancement, and do not participate in TA rotations. (Exh. 3, ¶3 to Defendant's Motion).

Production associates are hired by Honda to work anywhere in the facility, although they are generally assigned to one section within the two main departments. Movement is always a possibility and no associate is guaranteed a particular length of time. Within each section, there are a number of different processes or job functions. Associates within a particular section are cross-trained to learn each process so that when an associate leaves or is absent, another associate within the section can fill in for the absent associate. (Exh. 2, ¶10 to Defendant's Motion).

Plaintiff became an associate at Honda on April 5, 1999. (Plaint. Aff. ¶3). Her first position

was in the Weld Section (Welding).  (Plaint. Aff. ¶ 4).  She remained in Welding for approximately four weeks.  During that time, she began to experience pain and numbness in her hands.  She sought treatment from the on-site nurse on April 26, 1999.  The pain appeared to be associated with plaintiff's welding work activities and certain essential functions required in Welding.  Plaintiff was later diagnosed with carpal tunnel syndrome and received medical treatment at McLeod Regional Medical Center for this condition.  As a result of her condition, a mutual decision was made to move her to the sub-assembly area to alleviate the pain in her right wrist.  (Exh. 10, ¶5 to Defendant's Motion; Plaint. Aff. ¶ 5).

In August 1999, Honda transferred plaintiff to the Customer Quality subsection of the Assembly section to fill a job vacancy.  (Exh. 14, ¶4; Exh. 12, ¶3 to Defendant's Motion; Plaint. Aff. ¶ 7).  In the Assembly section, plaintiff inspected and repaired parts as the ATV's came off the assembly line.  One of the essential functions of this position was to ride the ATV's to an inspection area.  Plaintiff was not able to grip firmly with her hands due to the pain in her wrist.  As a result, plaintiff was involved in an incident were she accidentally ran into a coworker because of her inability to control the ATV with her hands.  (Plaint. Aff. ¶ 8).  As a result, Tom Simms, the Manager of Manufacturing, reassigned plaintiff to the Pack section in late December 1999.  (Exh. 10, ¶6, Exh. 14, ¶4 to Defendant's Motion).

Plaintiff remained in the Pack section for approximately one month.  After continuing to experience pain in her wrist[1] from the required use of a staple gun to perform her duties in Pack, plaintiff complained to her coordinator.  Her condition was accommodated and in an effort to allow

---

[1] On one occasion, she went to the plant nurse who took her to McLeod Medical Center for treatment.  (Plaint. Aff. ¶ 9).

-3-

her arm and wrist to heal in January 2000, she was transferred to Material Services.  (Exh. 12, ¶4, Exh. 10, ¶7 to Defendant's Motion; Plaint. Aff. ¶ 10).  When she initially transferred to Material Services, plaintiff was assigned a "paper the yard" duty which involved carrying around a bag and picking up trash.  (Plaint. Aff. ¶ 11).  She was subsequently assigned to scan delivery slips into a computer when inventory was received. (Plaint. Aff. ¶ 12).  She took on more duties in Material Services over time.  (Plaint. Aff. ¶ 13).

In June 2000, John Gaster (Gaster) became the Coordinator for Material Services and implemented a cross-training program in order to train associates in Material Services to do other processes, as it appeared that most of the associates in Material Services had not performed any other process and could not fill in for another process if an associate were sick or left Honda.  (Exh. 14, ¶7; Plaint. Aff. ¶ 16).  In order to implement the cross-training[2], Gaster needed to cross-train new associates hired into Material Services.  A new associate, Brenda Allen (Allen), a white female, had computer skills on her resume.  (Exh. 25, ¶ 3; Exh. 14, ¶ 7).  Therefore, Gaster decided to have Jackson train Allen on the scanning position. (Plaint. Aff. ¶ 17).  After having trained Allen, Jackson was rotated to the "knock down" area within Material Services, which required her to unpack parts shipped from Japan and to distribute them where they are needed within the plant or to ship them to Honda suppliers.  (Exh. 14, ¶ 10; Plaint. Aff. ¶ 18).

Jackson remained assigned to the "knock down" area until  July 28,  2001, when Jackson injured her back in a work-related incident.  (Exh. 15, ¶ 4; Plaint. Aff. ¶ 19).  Jackson was out of work until November 21, 2001, when she had completed a series of Occupational Therapy visits

---

[2] The only time plaintiff observed someone being cross-trained was when she was replaced.  (Plaint. Aff. ¶ 16).

between October 31, 2001, to November 21, 2001, to improve her lower back flexibility and

strength. Jackson's physician, Dr. Floren, issued a Patient Encounter Sheet on November 21, 2001,

after evaluating Jackson and the progress and discharge notes of John P. Zelenka[3].  Dr. Floren

-------

[3]  The Discharge Note dated November 21, 2001, reads as follows:

Ms. Jackson received 14 Occupational Therapy visits from October 31, 2001 to November 21, 2001.  She received treatments of lower back flexibility and strengthening exercises, cardiovascular exercise and hot packs.

Ms. Jackson did not improve in therapy.  She reported lower back discomfort levels from 4 to 10 during her course of therapy.  On one occasion, client reported that her lower back felt good when she reported lower back discomfort at level 4.  Client reported no change in her condition from her course of therapy.  I discharged client on this date due to failure to improve.  Client appeared to show signs of symptom magnification/exaggeration.

During Ms. Jackson's intake, she demonstrated 3/5 Waddell signs, which could indicate non-organic signs of pain.  Thought therapy, Ms. Jackson seemed to show inconsistent signs of discomfort.   Most often, client showed the ability to walk comfortably on the treadmill, showing an ability to smile.  Just before and immediately after her walk, she walked slowly and with a limp.

Ms. Jackson seemed dramatic in her pain behaviors.  I modified her program from the standard exercises, which included supine flexibility and strengthening exercises.  Client reported that these exercises increased her lower back discomfort and she could not tolerate this discomfort.  As a result, I provided her with very mild exercises that required sitting, standing, or squatting.  I also asked her to be gentle with these exercises and not cause increased pain.  Regardless, client reported increased and significant pain; she showed the behaviors of holding her hands to her face, grimacing, and slow movements.  (Simultaneously, she still showed an ability to carry on a conversation and joke with other patients.)  She appeared to show signs of symptom magnification by her uncontrolled ability to affect her symptoms by self-limiting her efforts.

In addition, during therapy, client consistently showed unusual sensitivity of her lower back.  Client withdrew her lower back from my hands during superficial light touch palpation.  I could not evaluate any muscle spasm or tone because of this behavior.  In contrast to this hypersensitivity, client showed the ability to rest her lower back against a tilted chair as her lower back made contact with the hot pack for 20 minutes.  She sat without any objective pain behaviors.  With this sensitivity, I do not know how client

-5-

imposed on Jackson permanent work restrictions that included no lifting, pushing, or pulling over 20 pounds, and no stooping, crawling, bending, or twisting.  (Exh. 4, ¶ 3; Exh. 36).[4]

After receiving the documentation containing the permanent work restrictions, Helton requested that Wendell Hughes (Hughes), the Coordinator for Safety and Environmental, make a diligent search to determine whether these permanent restrictions imposed by Dr. Floren could be accommodated.  Hughes was requested to look for a job placement in Material Services, where Jackson had previously been assigned, or in any of the other production sections.[5]  In December 2001, Honda concluded that there was no job available that could accommodate the permanent work restrictions imposed by Jackson's physician.  Helton informed Jackson of this by letter dated December 28, 2001.  (Exh. 29, ¶¶ 4-7; Exh. 4, ¶¶ 5-7).

Plaintiff sent to Bill Kalp a letter dated December 10, 2001, which reads as follows:

I am writing this letter to you, not knowing if you are aware of my situation.

_____

can sit in a chair, drive, or allow clothing to touch her lower back.
    The progress note from the Occupational Therapist reads as follows:
S: Client reported that she scheduled to see Dr. Floren this morning at 1000 hours.
     Client reported no change in her condition.
O: Client walking slowly in the clinic again today.  She frowned when she reported no change of
     her lower back condition.
     Client not making satisfactory improvement in therapy.
A: No improvement.
P.  Discontinue patient.
     Refer back to Dr. Floren.

[4] In her affidavit at paragraph 21, plaintiff asserts that at some point prior to November 21, 2001, she was cleared to return to work without restrictions, but that after a telephone call from the plant nurse, Trudy Carter, Dr. Floren changed his mind, prescribed more therapy, and kept her out of work.  This hearsay statement is not supported by the record and is not considered for purposes of this motion.

[5] During this time, plaintiff frequently called Jeff Helton to inquire as to when she could return to work.  (Plaint. Aff. ¶¶ 24-26).

-6-

My name is Patricia A. Jackson.  I am presently out on medical leave due to an injury I sustain July 28th of this year.  I was released to return to work on October 23, 2001.  I was suppose to return to work on the 24th, but when I called Trudy Carter (nurse) and told her I had my excuse to return to work, she ask me if I had any restrictions, and I told her no, then she told me I need some restrictions because I had been injured before, as she told me she was going to put an appointment in for me to see Dr Floren, (plant doctor).  She called me back within minutes and inform me that she had made app. for me 9:00 the next morning, which was the day I was suppose to go to work.

I went to see Dr. Floren, and he put in a work recovery program for three more weeks.  On November 21st he release me to return to work on the 26th the following Monday, so I call to let Trudy know that I would be returning to work, but she already received my paperwork from the doctor, and she knew he had put me on permanent light duty, so she called and told me that Jeff Helton said for me not to report to work that Monday, because he had to find me a position for me, I didn't report that Monday, but I call back that Tuesday to see if he found a position for me.  Jeff called me back on Nov. 29th, 30th, Dec. 3rd, 4th, and the 5th with the same story that he was in meeting and they (he and Wendell, safety man, Tom Sims) still hadn't find me a position.  Now my question is when I didn't have no restrictions I was not allow to return to work, now that the doctor have on permanent light duty, they still can't find me nothing to do, what is going on?  And Why?  Like I said earlier, I don't know if you aware of this matter, but I want to be sure you knew.  If you want to meet with me concerning this, just make me an appointment.  I told Jeff on the 29th of November if be back at work, I was going to put in for two vacation days on Dec. 13th, and 14th to be with husband which is being admitted to the hospital.

In conclusion I would like very much to here from you about this matter.  I did not ask to get fired, matter of fact I was helping someone else.  My attendance is perfect, I never been late for work, and I volunteer to work a lot of over time, and I have been employed since 1999, now there aren't many people who can say they have not miss work in about three years and be to work on time everyday.  I am enclosing a copy of the excuse that I received from Dr. Edwards to return to work on the 24th of October 2001.

Plaintiff filed her Charge of Discrimination on March 21, 2002.  In the charge, plaintiff complains as follows:

I.   Personal Harm: On or about December 26, 2001, I was denied reinstatement and subsequently discharged.

II.  Respondent's reason(s) for adverse action(s): No position available.

III. Complainant's Contention(s): I content that there were positions

available that I was qualified for and able to perform the essential functions thereof. On July 28, 2001, I suffered an on-the-job injury which caused me to have a medical condition of which the Respondent was aware. When the company doctor released me to return to work, with permanent restrictions, I was denied reasonable accommodation. I believe the Respondent's action in this matter was retaliatory to my charge of discrimination [] against them. IV. Discrimination Statement: I therefore believe that I was discriminated against in retaliation for my opposition to unlawful employment practices, in violation of SC Human Affairs Law, as amended, Title VII of the US Civil Rights Act of 1964, as amended, and the US Americans with Disabilities Act of 1990, as amended.

Plaintiff filed a previous Charge of Discrimination on July 19, 2000, which reads as follows:

I. I have been subjected to adverse terms and conditions in employment to include being denied the opportunity to serve as the team advisor, being called a trouble maker by Glen Dubridge, coordinator, having fault found with my performance by the same individual, being denied the righht to wear my doctor-prescribed shoes, being denied training when I was moved to material services in January 2000, being yelled at, being cursed at, being forced to train a white co-worker to take my job on June 23, 2000, being denied equal training to this same newly hired co-worker on July 12, 2000 and being advised of yet another transfer to the K-D area on July 12, 2000.
II. No reasons have been given as to why myself and other black employees are subjected to such actions, yet white employees are given preferential treatment with respect to general employment issues. I believe these actions to also be in retaliation for my internal complaints of racial discrimination involving a white temporary employee.
III. I believe I have been discriminated against because of my race (black) and in retaliation of my opposition to employment practices declared illegal by the SC Human Affairs Law, as amended and Title VII of the US Civil Rights Act of 1964, as amended.

During a hearing before the South Carolina Worker's Compensation Commission on January

9, 2003, plaintiff testified as follows:

Q: Okay, did you like working at Honda?

A: Yes, sir
. . .

Q: Okay. Did you like working over there after you'd been working there for

-8-

awhile?

A: Yes, sir.

Q: Why?

A: It was an experience – I like – I like doing – it was a challenge and I like the position I was in and I just like – I just liked working for Honda because of the atmosphere, and it was a good place to work for . . .

Plaintiff submits her affidavit allegedly describing a charged racial environment. After the hearing held August 2, 2006, the defendant submitted a brief on August 7, 2006, addressing these allegations. Defendant challenges the allegations contained in plaintiff's affidavit, among other reasons, because she first reveals them in her affidavit dated January 26, 2006, after she has filed two charges of discrimination with the EEOC, testified at a worker's compensation hearing, and completion of discovery in this case. Plaintiff's affidavit is discussed below.

Plaintiff's affidavit contains 91 paragraphs. Paragraphs 27 through 84 contain the relevant allegations. Paragraphs 27 through 56 fall under the heading "Racial Harassment at Honda," paragraphs 57 through 70 fall under the heading "Retaliatory Harassment," and paragraphs 71 through 84 fall under the heading "Reports of Race Discrimination to Management." Some of the paragraphs stand on their own and some series of paragraphs address particular incidents. They will be addressed categorically as to incidents. Defendant challenges the allegations as speculative, hearsay or contradictory. Defendant's opposition to the respective allegations will be discussed, as well.

1. Paragraph 27 through 37

In 1999, Chad, a temporary employee and co-worker, called plaintiff a "black nigger bitch." Plaintiff reported the incident to John Gaster. According to plaintiff, Mr. Gaster took no action, and

the following day Chad called her a "Mother-fucking black bitch." She reported the incident to Linda Fountain, a supervisor. According to plaintiff, Ms. Fountain called a meeting with Chad, Mr. Gaster, and plaintiff, and after the meeting Chad's temporary employment was terminated.

Defendant sets forth by chronology the evolving nature of Chad's statement. In her charge of discrimination of July 13, 2000, the statement was "black bitch." She reported it to management and after a meeting Chad was terminated. In her October 31, 2003, *pro se* complaint, the statement was "nigger bitch." In the amended complaint filed March 29, 2004, the statement was "black bitch" and "mother-fucking black bitch." In her deposition of September 29, 2004, the statement was "black nigger bitch" on two occasions and "mother-fucking black bitch" on another occasion. As set forth above, in her affidavit of January 26, 2006, the statement was "black nigger bitch" and "mother-fucking black bitch."

Defendant challenges this statement as contradictory testimony on the basis that it has been embellished over time. Additionally, defendant challenges as hearsay plaintiff's testimony as to what Mr. Gaster did or did not do.

## 2. Paragraph 38

On December 2, 1999, a black associate cursed plaintiff, saying "fuck Pat." Plaintiff reported the incident to Glen Dubridge. Plaintiff claims the black associate was not disciplined and Mr. Dubridge was not responsive to her complaint.

As set out below, in paragraph 84 she claims the employee making the statement was white and was named Barry. In her deposition, Barry was a "black guy" and called her "bitch."

## 3. Paragraphs 39 through 44

In January 2000, plaintiff had trouble with her foot and had outpatient surgery to remove an

ingrown toenail. According to plaintiff, she provided an excuse from her physician to wear non-steel-toed shoes. Mr. Gaster and Mr. Dubridge directed her to wear steel-toed shoes or go home.

A white employee, Lynn, who had a broken toe was allowed to work with an opened-toed shoe.

She reported this to Mr. Gaster and Mr. Dubridge and advised them that she felt it was discriminatory and based on race. She also went to Bill Kalp, the president of the company, and told him she felt she was being treated badly because of her race.

Defendant presents uncontradicted evidence that Lynn Simpson incurred an on-the-job injury, a broken toe, and was allowed to temporarily work in the operations center, while seating with her foot elevated. Defendant asserts that plaintiff's injury was not work-related and she was not offered a similar accommodation.

4. Paragraph 45

In June 2000, she was replaced in the material services area by Brenda Allen, a white associate. She was told this was part of the cross-training program. She never saw anyone else cross-trained. She told Mr. Gaster she thought this was racist.

As set forth by defendant, at the hearing held August 2, 2006, plaintiff's counsel conceded that there was no evidence to contradict the affidavit testimony presented by defendant showing the cross-training program continued and that both white and African-American employees rotated through the material services area. Accordingly, plaintiff's assertion that the cross-training program was not implemented and that her rotation out of the material services area based upon race has no basis in the record. Therefore, the assertion should not be considered for any purpose in this lawsuit based on the record presented.

5. <u>Paragraph 46</u>

She heard an associate named Billy call Japanese workers "yellow bastards." She reported this to Mr. Kalp on June 24, 2000.

Defendant challenges this statement because is does not refer to a time, place or specific identification of speaker. Also, plaintiff testified at deposition that Billy was later terminated. Defendant asserts that it is unable to establish the truth of this statement (confirm the corrective action it took) because plaintiff does not provide the time, last name of billy or other specific information. Additionally, it argues that plaintiff fails to provide a foundation for her personal knowledge as to what management did or did not do.

6. <u>Paragraph 47</u>

On June 6 and June 7, 2000, she observed a white associate commit an offense (did not turn on warning light when unloading truck) for which they had been told would result in termination. Management was informed, but did not take any action.

Defendant identifies testimony in her deposition where plaintiff admits she has no personal knowledge of whether or not management took action against this white associate.

7. <u>Paragraph 48</u>

On June 20 and June 21, 2000, a big white male bumped into plaintiff at the time clock without apologizing. She reported this to Jeff Helton. Later that day, plaintiff saw the big white male in the parking lot. Plaintiff surmise that someone spoke to him about plaintiff complaint. He called her a "nigger." She reported this to Eric, his coordinator, Matthew Milligan, Tom Simms, and Mr. Gaster. Plaintiff asserts that the big white male's employment was not terminated.

Defendant asserts that the affidavit is the first it has heard of this incident and it provides no

identification of the wrongdoer, leaving it unable to investigate the allegation.  Thus, it argues, it should be excluded from consideration.

8.  Paragraph 49

On June 24, 2000, a white female associate was allowed a schedule accommodation to take her son to his baseball games; however, a black associate was not allowed a half day off to attend a funeral.

Plaintiff admitted at deposition that she had no personal knowledge of this.

9.   Paragraph 50

On August 14, 2000, two white workers were chosen among a shift of four to transfer to a better shift, while the remaining two black workers remained on the existing shift.

Plaintiff admitted at deposition that she has no personal knowledge of this incident.

10.  Paragraph 51

On August 14, 2000, a white worker was allowed to return to work without a doctor's excuse by Jeff Helton after the worker's black supervisor refused to allow him to return without the excuse.

Plaintiff admitted at deposition that she has no personal knowledge of this.

11.  Paragraph 52

Plaintiff was required to have a drug test performed each time she was injured at work.  On August 18, 2000, she witnessed a white worker, Michelle, get injured and not be required to take a drug test.

Plaintiff admitted at deposition that she had no personal knowledge of any injury to Michelle. Obviously, her only knowledge about whether or not Michelle was required to take a drug test involves hearsay.

-13-

12. Paragraph 53

On August 22, 2000, a white worker was allowed to return to work a day after he attacked another worker on the job.

As set forth by the defendant, plaintiff does not provide a foundation for personal knowledge, and no other alleged information is provided to relate it to discrimination.

13. Paragraph 54

On September 18, 2000, a white associate and black associate got into a fight.  The white worker was not fired, and the black worker's employment was terminated.

At deposition, plaintiff testified that she did not have personal knowledge of this incident, did not know the disciplinary record of either involved, and did not have personal knowledge of their employment status after the incident.

14. Paragraph 55 through 56

On October 4, 2000, plaintiff reported another employee, Mark Richardson.  After reporting the employee, a group of co-employees, including Rosa Stokes, Angela Allen, Clifton Anderson, Billy Davis, Jean Matthews, and others, called her "nigger" and "nigger bitch."  She reported this to Mr. Helton and Mr. Kalp and the employees were not disciplined.

Defendant asserts that this is insufficient in and of itself to constitute racial harassment.  It also argues that plaintiff fails to establish that the slurs made by the co-employees were based on her reporting Mr. Richardson.  Further, it argues that plaintiff's testimony is not credible.

15. Paragraphs 57 through 64

From August 9 through 14, 2000, plaintiff was responsible for cleaning trashcans.  A white employee, Shane violated company rules by using smokeless tobacco in the plant.  He spit tobacco

into the water fountain and trash can. She reported this to Mr. Dubridge who did not take any action. Plaintiff did not clean the trash can. Mr. Dubridge told her he had heard she was a trouble maker and told her not to come in early for overtime anymore. She claims Mr. Dubridge starting finding fault with her work on a regular basis after this incident.

16.  Paragraph 65

Mr. Dubridge yelled at plaintiff and another black co-worker in front of white co-workers and supervisors. The other African-American co-worker began crying.

17.  Paragraph 66 through 67

A white female coworker told her of a rumor that Mr. Helton wanted to fire plaintiff. Plaintiff confronted Mr. Helton and he did not "really answer my question," but instead asked if she was tape recording what people said at Honda and if she had any video footage. He told her to stop keeping notes because it made people nervous.

18.  Paragraph 68 through 70

Plaintiff filed a charge of discrimination on July 19, 2000, following which co-worker began calling her "Rosa Parks." She reported this to Mr. Helton and it did not stop.

19.  Paragraphs 71 through 84

In paragraphs 71 through 84, plaintiff sets forth the reports she made to management regarding her claims of racism.

Plaintiff claims she reported racism to Bill Kalp on January 17, 2000, June 24, 2000, December 1, 2001, and other times as follows:

> • Told him she was still experiencing racist comments and seeing racist decisions carried out every day. Told him she felt she was being retaliated against by supervisors for having made complaint of

race discrimination.

• Told him there was a serious problem at the plant with race discrimination based on decisions management made and racial slurs by the workers.

• Reported to him that white workers were cursing at her and saying racial things to her and the comments continued to be made.

• Reported that a co-worker, Mark Richardson, told her jokes that included the word "nigger."  Mr. Kalp and Mr. Simms promised to meet with her about this, but never did.

• Sent a letter to Mr. Kalp on December 1, 2001.  This is the letter set forth above.  It does not complain about racism but about returning to work.

Plaintiff claims she reported racism to Tom Simms on several occasions as follows:

• Reported to him that white workers were cursing at her and saying racial things to her and the comments continued to be made.

• After a meeting with Mr. Simms, he asked her to write down her complaints about race discrimination.  She did so and placed the writing in his box.  She later ran into him and he told her he did not receive it.  She told him of the racial comments she was receiving at work.  Again, he asked her to write them down.  She did not because she felt nothing would be done.

• A co-employee, Shane, continually made racist comments to her.  She reported this to Mr. Simms and nothing was done.

• Reported that a co-worker, Mark Richardson, told her jokes that included the word "nigger."  Mr. Kalp and Mr. Simms promised to meet with her about this, but never did.

Plaintiff claims she reported racism to Mr. Gaster on several occasions as follows:

• On September 2, 2000, she reported the "cross-training" incident to Mr. Gaster, complaining that she felt she was moved out of the material services area based upon race discrimination.  She claims Mr. Gaster listened but did nothing about it.

• On September 19, 2000, she met with Mr. Gaster and told him she had observed a white employee breaking company rules and not being punished, told him of the "cross-training" involving Brenda Allen, and told him about the altercation she saw between a white worker and African-American worker which resulted in only the African-American's employment being terminated. She claims the white worker had been picking on the African-American worker for months and the African-American got tired of it and they engaged in the altercation.

• After she reported the big white male continually bumping into her at the time clock, she thinks he got in trouble. After she saw him later and he called her "nigger," she reported this to Mr. Gaster. She claims the worker was not terminated.

She asserts that on September 22, 2000, she reported the "cross-training" situation to Jeff Helton and he did not take any action.

On December 2, 1999, she reported to Mr. Dubridge that a white co-worker, Barry, said, "fuck Pat." Mr. DuBridge responded that the employee said "fuck that." Mr. DuBridge took no action.

## *Discussion*

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP. The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward

with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

As set forth above, the amended complaint alleges four causes of action: (1) racial harassment under Title VII and §1981; (2) retaliatory harassment under Title VII and §1981; (3) retaliation/wrongful discharge under Title VII and §1981; and breach of contract under state law. Defendant seeks summary judgment against each of her claims.

Defendant argues and plaintiff concedes that plaintiff's claims for racial harassment and retaliatory harassment under Title VII and contained in the First Cause of Action and the Second Cause of Action are barred by the statue of limitations.[6] However, plaintiff asserts that these claims are viable under 42 U.S.C. §1981a[7]. Plaintiff also claims retaliatory discharge under Title VII and §1981 (3rd Cause of Action).

***Wrongful/retaliatory Discharge Claim*s**

Plaintiff's claim for wrongful discharge and retaliatory harassment hinges on whether or not the "cross-training" implemented by Mr. Gaster was actually implemented. Plaintiff claims that except for the time Brenda Allen rotated into plaintiff's position in the material services area, no "cross-training" was actually implemented. Plaintiff relies on her own testimony for support. She testified that she only observed Brenda Allen being rotated into her position, but no other employee being cross-trained. She fails to submit any other evidence challenging defendant's uncontradicted evidence that cross-training was, in fact, implemented.[8] Plaintiff, in essence, concedes that based

---

[6] Plaintiff's Charge of Discrimination relating to these claims was filed and she received her right to sue letter on April 23, 2001. Plaintiff did not file the instant lawsuit until October 31, 2003.

[7] The statute of limitations in a §1981 action is four years. Jones v. R.R.Donnelley & Sons, 541 U.S. 369 (2004).

[8] In fact, it is uncontradicted that an African-American rotated in and out of the material services area after plaintiff rotated out. *See* Hope Green Affidavit.

on the competent evidence in the record, this claim lacks merit.  Additionally, after her assignment out of the material services area, plaintiff was assigned to the knock-down area where she injured her back which eroded her ability to work as indicated by the restrictions placed on plaintiff by Dr. Floren.  Also, plaintiff testified that she remains unable to work because of the lingering effects of her physical injuries sustained while working with defendant.  (Plaint. Depo. at 285-86, 328-29).

Therefore, defendant's motion for summary judgment against plaintiff's claim for wrongful discharge and retaliatory discharge should be granted.

Plaintiff's potentially viable claim rests with her claim for hostile environment and retaliatory harassment.  These claims survive, if at all, on the basis of the allegations contained in her affidavit submitted January 26, 2006.

***Racial Harassment (§1981)(Hostile Environment)***

To establish a hostile work environment claim, plaintiff must show: (1) the conduct was unwelcome; (2) it was based on the plaintiff's race; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.  Spicer v. Virginia, 66 F.3d 705, 710 (4th Cir. 1995)(en banc).

Defendant argues that plaintiff fails to establish the final three elements of a *prima facie* case. To qualify as sever and pervasive for purposes of Title VII, the harassment must be objectively and subjectively severe or pervasive as to alter the conditions of plaintiff's employment and render the workplace abusive.  Faragher , 524 U.S. at 786; Hartsell v. Duplex Products, 123 F.3d 766, 773 (4th Cir. 1997).  The Fourth Circuit has utilized a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the

discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir. 2000).

The Fourth Circuit has explained:

> Far more than a mere offensive utterance, the word "nigger" is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguous racial epithet such as "nigger" by a supervisor in the presence of his subordinates.

White v. BFI Waste Services, LLC, 375 F.3d 288, 298 (4th Cir. 2004)(internal quotes omitted)(quoting and citing Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668 (7th Cir. 1993).

It is undisputed that "Chad" called plaintiff a "nigger" in 1999 (No. 1 above). In the light most favorable to the plaintiff, a "big white guy" called her a "nigger" on June 20 and June 21, 2000 (No. 7 above); and a group of in excess of five employees called her "nigger" and "nigger bitch" on October 4, 2000 (No. 14 above)

Also, in the light most favorable to the plaintiff she reported both specific and general complaints of racism and racial slurs being made against her to Mr. Kalp, Mr. Simms, and Mr. Gaster. In the light most favorable to plaintiff, Mr. Simms and Mr. Kalp promised to meet with her but never did. Also, a reasonable inference drawn from her testimony is that no supervisor or management to which she complained at least did not follow-up with her.

While the record may contain considerable information that defendant may use to attack the credibility of plaintiff, that is not the function of Rule 56.[9] Matters of credibility are left to the

_____

[9] The standard under Rule 56 is more restrictive than that applied when considering a directed verdict after plaintiff has presented her evidence at trial. See Ross v. Communications Satellite Co., 759 F.2d 355, 363 (4th Cir. 1985).

-21-

judgment of the jury.  Also, while, based on the record, plaintiff is not competent to testify as to much of the inaction of supervisors or management[10] asserted in her testimony, she is competent to testify to that set forth in the paragraph above.

Accordingly, plaintiff has forecast sufficient evidence to show a sufficiently severe or pervasive work environment.

If the offending party is the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible employment action.  <u>Faragher</u>, 524 U.S. at 807.  If the offending supervisor did not commit a tangible employment action, the employer can avoid liability if it can show (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided.  <u>Id</u>.

Because no tangible employment action was involved, defendant can avoid liability if it can establish (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant, or failed to avoid harm otherwise.  <u>Faragher</u>, 524 U.S. 809.

As stated above, in the light most favorable to the plaintiff, she endured the racial slurs and epithets and complained to supervisors and management of the specific incidents as well as racism generally.  Further, in the light most favorable to the plaintiff, the supervisors and management failed

---

[10]  Plaintiff's affidavit is riddled with assertions that employees were not disciplined by supervisors or management or supervisors or management did not take action.  Plaintiff does not provide a foundation for her competence to testify to such matters.

...

to take responsive action.[11]

Accordingly, plaintiff establishes her *prima facie* case and defendant's motion against plaintiff's claim for hostile environment must fail.

### Retaliation Claim

42 U.S.C. §2000e-3(a) provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

In order for plaintiff to state a *prima facie* case for retaliation under the opposition clause, she must show (1) she engaged in a protected activity, (2) defendant took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 271 (4th Cir. 2001); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). In order to establish the requisite causal connection, plaintiff must proffer evidence which establishes that she would not have been terminated but for her protected activity. Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 755 (4th Cir. 1996).[12]

Not only did plaintiff complain to supervisors and management, she filed an EEOC charge

---

[11] As argued by the defendant, they are presented with a quagmire with much of this testimony. In other words, how can they take responsive action to complaints to which they were unaware. Of course, to determine whether or not plaintiff made these complaints involves issues within the province of a jury.

[12] The principles applicable to §1981 are the same as those for determining liability under Title VII. Jordan v. Alternative Resources Corp., 447 F.3d 324, 334 (4th Cir. 2006)(citing Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180 (4th Cir. 2004)).

on July 19, 2000.  Accordingly, she engaged in protected activity.

Conduct short of "ultimate employment decisions – to hire, discharge, refuse to promote, etc. – can constitute an adverse employment action under Title VII." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001).  Retaliatory harassment also can constitute an adverse employment action. Id. (Citing Ross, 759 F.2d at 363).  Plaintiff must establish that the challenged discriminatory acts of harassment "might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern & Santa Fe Railway Co. v. White, – U.S. –, 126 S.Ct. 2405, 2415 (2006) (citing Rochon v. Gonzalez , 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Although difficult to decipher, it appears that plaintiff offers the "cross-training" allegations and retaliatory harassment as the adverse employment actions.  Again, the allegation regarding the "cross-training" has no merit.  However, plaintiff also argues that the supervisors and management failed to take action upon her complaints of racism and racial slurs in retaliation for her protected activity.  In the light most favorable to the plaintiff, ignoring her both specific and general complaints of racial slurs and conduct might well dissuade a reasonable worker from making or supporting a charge of discrimination.  In fact, plaintiff testified that she decided not to submit a written record of her complaints to Mr. Simms for a second time because she believed nothing would be done.

Accordingly, defendant's motion for summary judgement against plaintiff's claim for retaliatory harassment should be denied as well.

***State Law Claim for Breach of Contract***

Plaintiff asserts also a state law claim for breach of contract based on an employment handbook.  Generally, employment in South Carolina is at-will unless there is a written contract.

-24-

Hudson v. Zenith Engraving Co., 273 S.C. 766, 259 S.E.2d 812 (1979). An employee handbook can form an employment contract that alters the at-will status of employment. Small v. Springs Industries, Inc., 292 S.C. 481, 357 S.E.2d 452(1987). In Small, the Court stated "[i]t is patently unjust to allow an employer to couch a handbook, bulletin or other similar material in mandatory terms and then allow him to ignore these very policies as 'a gratuitous, nonbinding statement of general policy' whenever it works to his disadvantage." Id. at 485, 357 S.C.2d at 455. The Small Court indicated that for a handbook to not alter the at-will status, it must contain a conspicuous disclaimer in the handbook. Id. In Fleming v. Borden, 316 S.C. 452, 450 S.E.2d 589(1994), the Court directed that it is generally and in most cases, a jury question whether or not the disclaimer is conspicuous. Id. at 464, S.E.2d at 596. The Court further espoused that the disclaimer is but one factor to consider in determining whether or not the handbook creates a contract. Id.

The Court in Fleming and more recently in Conner v. City of Forest Acres, 348 S.C. 454, 560 S.E.2d 606 (2002) the court placed great emphasis on the "mandatory", "promissory" nature of the language contained in the handbook in determining whether it altered the at-will employment status. Small, 292 S.C. at 485, 357 S.E.2d at 455; Fleming, 316 S.C. at 463, 450 S.E.2d at 596, Conner, 348, S.C. at 464, 560 S.E.2d at 611.

Accordingly, we must look to the language of the handbook itself to determine if there is "mandatory", "promissory" language contained therein. To determine this, we should view the document as a whole, including but not limited to considering the conspicuousness of any disclaimers. Fleming, 316 S.C. at 463; 450 S.E.2d at 596. (Citing Stephen F. Befort, Employee Handbooks and the Legal Effect of Disclaimers, 13 Indus.Rel.L.J. 326, 375-76 (1991-1992).

Plaintiff claims she was issued a handbook which contains promises of non-discrimination.

She relies on the statement contained in defendants "Operating Philosophy" which reads as follows:

> Equality: Equality means to recognize and respect the individual differences in one another and to treat each of fairly. Our company is committed to these principals and to create equal opportunities for each individual. An individual's race, sex, age, religion, national origin, veteran status, disabilities, education background, social, or economic status have no bearing on the individual's opportunities.

(Exh. 5 to Defendant's Memorandum)

The policy statement offered by plaintiff generally refers to "opportunities" and is not explicit, mandatory language promising no discrimination in the workplace. Regardless, an employer's general non-discrimination policy is too indefinite to sustain a cause of action for breach of contract. Hasseenthaler v. Tri-County Sister Help, Inc., 616 S.E.2d 694, 698 (S.C. 2005). The policy in Hassenthaler provided

> [employer] is an equal opportunity employer. All decisions, including hiring, training, and promotion, are made without regard to race, color, religion, national origin, sex, age, handicap, sexual preference, or any other protected status.

Id.

The policy language advanced by plaintiff did not alter plaintiff's at-will employment status as a matter of law. Accordingly, defendant's motion for summary judgment against plaintiff's state law claim for breach of contract should be granted.

### *Defendant's Counterclaim (cross motions)*

Plaintiff moves for summary judgment (Document # 58) against defendant's counterclaims. As part of its motion for summary judgment (Document # 69), defendant seek summary judgment in favor of its counterclaims. Generally, plaintiff obtained possession of certain documents, which defendant claims are confidential and proprietary, while employed by defendant and defendant seeks

their return.  It is undisputed that these documents could effect defendant's competitiveness if in the hands of a competitor.  It is also undisputed that plaintiff has not disseminated or disclosed the documents to any third person (other than her attorney).

Defendant alleges two causes of actions.  It maintains a common law cause of action for breach of loyalty and a state statutory cause of action for misappropriation of trade secrets, South Carolina Code  §39-8-10, *et seq*.

It is clear that the common law in South Carolina recognizes a duty of loyalty by an employee to an employer.  *See* Young v. McKelvey, 333 S.E.2d 566, 567 (S.C. 1985); Berry v. Goodyear Tire & Rubber, 242 S.E.2d 551, 552 (S.C. 1978); Lowndes Products, Inc. V. Brower, 191 S.E.2d 761, 767 (S.C. 1971); *See also* Food Lion, Inc. V. Capital Cities/ABC, Inc., 194 F.3d 505,55515-16 (4th Cir. 2000).  Plaintiff claims that a breach of loyalty is available exclusively as a defense to a claim for past compensation or other remuneration.  The South Carolina courts have not spoken to this precise issue.  *See* Futch v. McAllister Towing of Georgetown, 491 S.E.2d 577, 583 n. 2 (S.C. App. 1998).  However, as set forth by the Fourth Circuit:

> Because Dale and Barnett did not compete with Food Lion, misappropriate any of its profits or opportunities, or breach its confidences, ABC argues that the reporters did not engage in any disloyal conduct that is tortious under existing law. Indeed, the district court acknowledged that it was the first court to hold that the conduct in question "would be recognized by the Supreme Courts of North Carolina and South Carolina" as tortiously violating the duty of loyalty. *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 964 F.Supp. 956, 959 n. 2 (M.D.N.C.1997). We believe the district court was correct to conclude that those courts would decide today that the reporters' conduct was sufficient to breach the duty of loyalty and trigger tort liability.

Food Lion, 194 F.3d at 516.

Plaintiff asserts that in order to maintain a claim for breach of loyalty, defendant must show

plaintiff used her position or confidential information gained while employed to injure the defendant through competition separate from employment.  Plaintiff further claims that because plaintiff has not used the confidential documents, defendant can not maintain an action for breach of loyalty. Plaintiff also presents testimony from defendant's 30(b)(6) witness that the witness was not aware of evidence that plaintiff was specifically told not to remove the documents. There was no warning written on the documents explicitly advising employees not to remove them.

Plaintiff further asserts that defendant has sustained no damages as a result of her obtaining and maintaining the documents.  While defendant vaguely challenges whether or not it has suffered monetary damages, it asserts that plaintiff retains possession of its confidential information and it wants the documents returned.

The proprietary documents fall into three categories: (1) parts checklist, which describes the parts used to assemble an ATV and where each goes on the assembly line; (2) production plans, which shows which model of ATV is being manufactured on a given day; and (3) vanning sequence, which shows which parts delivery trucks are to be unloaded each day, as well as which parts are going to be unloaded depending on the ATV model being manufactured.

Combined together, these documents contain the parts used, the sequence and procedure employed, and the production schedule of defendant's manufacturing process.  Defendant presents evidence that it has expended significant time and resources to developing this information and it considers this information a protected trade secret.  Also, defendant presents testimony that a competitor could use this information to improve its own efficiencies.

Defendant presents testimonial evidence that it advised employees of the need to maintain such documents as confidential.  Defendant also presents its written Management Policy which

generally advises about keeping proprietary information confidential.  Also, defendant provides testimony that each new employee is provided a copy of this policy.

Defendant maintains security at this facility by restricting access to the production area, prohibiting the use of cameras in the production area, requiring all visitors to the plant to register and be escorted when allowed in the production area.  Also, an employee must obtain permission to remove property of defendant from the plant building.  However, plaintiff claims she was never told not to remove the documents and did not receive any written policy regarding these documents  and defendant does not provide specific proof except for their policies, procedure and practice.

Clearly, the documents are the property of defendant and it maintained policies and procedures to keep the documents confidential.  Whether or not plaintiff was aware of defendant's policy and procedures and whether she removed them knowingly without the permission of defendant presents an issue of fact for the jury.  As to damages, defendant asserts that it is at least entitled to injunctive relief due to plaintiff's refusal to return the documents.  The undersigned agrees.  Accordingly, both plaintiff's motion and defendant's motion should be denied with respect to defendant's common law claim for breach of duty of loyalty.

Defendant also asserts a counterclaim under the South Carolina Trade Secrets Act.  §39-8-30(B) creates a duty of every employee who knows or should reasonably know of their employer's trade secret to not use or disclose the trade secret.  §39-8-30(C) provides an action to the employer aggrieved by a "misappropriation, wrongful disclosure, or wrongful use" of their trade secret, including damages and injunctive relief.

§39-8-20(5) defines "trade secrets" as follows:

(a) information including, but not limited to, a formula, pattern, compilation,

program, device, method, technique, product, system, or process, design, prototype, procedure, or code that:

(i) derives independent economic value, actual or potential, from not being generally know to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(b) A trade secret may consist of a simple fact, item, or procedure, or a series of sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items or procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.

Clearly, in the light most favorable to the defendant, the confidential documents contain "trade secrets" as defined by the statute. However, whether or not plaintiff knew or should have known that the documents contained trade secrets presents an issue of fact.

§39-8-20(5)(a)(ii) requires an employer to take reasonable steps to maintain the secrecy of the trade secrets to expect protection. Whether defendant took reasonable steps to maintain the secrecy of the trade secrets presents an issue of fact, as well. They clearly had a policy and generally maintained security measures. Whether or not the policy was implemented, was sufficiently communicated to employees, or other circumstances existed making their efforts reasonable is a question for the jury.

§39-8-30(C) limits a cause of action to a person aggrieved by misappropriation, wrongful disclosure, or wrongful use and allows such person to recover damages as a result of wrongful acts and to enjoin its appropriation, disclosure, use, or wrongful acts pertaining to the trade secrets.

There is no evidence of wrongful disclosure or wrongful use. However, as set forth above,

-30-

an issue of fact exists as to whether or not plaintiff knew she was removing the documents without the permission of defendant. *See* South Carolina Code §39-8-20(2)(a). Additionally, if defendant is successful in proving liability under the Act, it may recover damages <u>and</u> injunctive relief. Hence, both parties' respective motion for summary judgment should be denied.

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment (Document # 58) be denied, and that defendant's motion for summary judgment (Document # 69) be denied in part and granted in part. Specifically, it is recommended that defendant's motion for summary judgment against plaintiff's claims for racial harassment (hostile work environment) and retaliatory harassment under 42 U.S.C. §1981 and in favor of its counterclaims be denied, and that the remainder of defendant's motion for summary judgment (against plaintiff's causes of action under Title VII and 42 U.S.C. §1981 for wrongful or retaliatory discharge, against her cause of action under Title VII for racial harassment (hostile work environment) and retaliatory harassment, and against her state law claim for breach of contract) be granted.

August 16, 2006                    s/Thomas E. Rogers, III
Florence, South Carolina         Thomas E. Rogers, III
                                 United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page(s)**

## Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"

### &

### The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503
